**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **OPTIMAS OE SOLUTIONS, LLC**, a Delaware LLC; | ) |
| | ) |
| | ) **Case No. 20-cv-00251** |
| Plaintiff, | ) |
| | ) |
| v. | ) **JURY DEMAND** |
| | ) |
| **ADAM GRIMES**, an Indiana resident, **JAMIE KUNTZ**, an Indiana resident, **GERALD ABRAHAM**, an Indiana resident, and **WÜRTH GROUP OF NORTH AMERICA INC.**, a Delaware Corporation; | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff OPTIMAS OE SOLUTIONS, LLC ("Optimas"), for its Complaint for Injunctive and Other Relief against Defendants ADAM GRIMES ("Grimes"), JAMIE KUNTZ ("Kuntz"), GERALD ABRAHAM ("Abraham") (Grimes, Kuntz, and Abraham are sometimes collectively referred to as the "Individual Defendants"), and Würth Industry of North America, a division of defendant WÜRTH GROUP OF NORTH AMERICA INC. ("Wurth"), states as follows:

## NATURE OF THE ACTION

1.      This is an action for injunctive relief and damages arising out of: (a) Defendants Grimes, Kuntz, and Abraham's breaches of their confidentiality and non-solicitation agreements with Optimas, through their employment with Wurth, one of Optimas's largest direct competitors in the custom and standard fasteners and other c-class product manufacturing and distributing industries; (b) Wurth's tortious interference with Optimas's agreements and unfair competition; and (c) the Defendants' actual and threatened trade secret misappropriation. Specifically, Optimas seeks to enjoin Defendants from utilizing or disclosing Optimas's trade secrets and

confidential and proprietary information, and to enjoin Grimes, Kuntz, and Abraham from soliciting Optimas's long-term and near permanent customers they solicited and serviced on Optimas's behalf. Optimas also seeks damages it has suffered because of Defendants' actions.

2.     Optimas is a global leader in the custom fasteners industry, helping its customers source custom and standard fasteners and other c-class products to manufacture and maintain the various heavy equipment, automotive, agricultural, power generation, healthcare, medical devices, and other industrial businesses that Optimas's end-user customers manufacture. Because of the nature of the work performed, Optimas forms long-standing, near permanent customer relationships, and acquires and creates scores of confidential information, relating to its customers' preferences, pricing, margins, sourcing, service requirements, and other strategies that Optimas employs to generate and maintain its customer relationships.

3.     For nearly 20 years, Optimas (and its predecessor Anixter Inc., before Anixter divested its fasteners business to form Optimas) employed the Individual Defendants in various sales, inventory management, sourcing, and engineering roles.

4.     Because of that employment, Optimas provided the Individual Defendants with access to and confidential information about, among other things, its customers, suppliers, and distributors, in particular a significant engine and power generation company (hereinafter, "Customer A"). In light of their positions and the sensitive relationships and information to which they had access, Optimas required each to sign an agreement containing certain reasonable, post-relationship restrictive covenants contained in their Confidentiality and Non-Solicitation Agreements (collectively, the "Agreements"). True and correct copies of the Agreements are attached as Exhibits 1 through 3.

2

5.     For well over a decade, Optimas, and before it Anixter, provided the Individual Defendants access to its most sensitive customer relationship and most sensitive customer-specific confidential information relating to Customer A. Indeed, Grimes, Kuntz, and Abraham have serviced and worked nearly exclusively with Customer A for over a decade. Customer A purchases tens of millions of dollars of product from Optimas yearly and constitutes one of its most important customer relationships.

6.     Optimas and Customer A have both a longstanding relationship and one governed by contract. Earlier this year, Customer A indicated that it would put up for bid certain aspects of the contract. Amongst the parties that indicated a desire to bid on this contract was Wurth.

7.     Unfortunately, rather than fairly compete, it seems that Wurth has decided that the best means by which to attempt to displace Optimas with Customer A was to hire and induce Grimes, Kuntz, and Abraham to breach their restrictive covenant agreements and to misappropriate Optimas's trade secrets.

8.     On December 20, 2019, Grimes, Kuntz, and Abraham all resigned en masse. All of them provided two-week's notice. When asked where they intended to take employment, they each stated that Wurth solicited them to work for Wurth, and further that Wurth doubled their salary to induce them to leave Optimas.

9.     Following their resignations, Optimas, individually and through its outside counsel, sent cease and desist letters to the Defendants, demanding that the Individual Defendants abide by their restrictive covenants and return Optimas's property, and that Wurth prohibit the Individual Defendants from breaching their Agreements, including by not working with Customer A for a period of 12 months, and informing it of the irreparable harm that Optimas will suffer if the Individual Defendants are permitted to work with Customer A and use

3

its confidential and trade secret information. None of the Defendants responded to Optimas's letters.

10. Despite Optimas's efforts to resolve this before filing suit, the Individual Defendants refuse to abide by their obligations. Indeed, Grimes, at a minimum, is already holding himself out as Customer A's Program Manager for Wurth on LinkedIn. Optimas is further informed and believes that Kuntz and Abraham are also working directly with Customer A, based on information it has received.

11. Based on their Agreements with Optimas, they are prohibited, for a period of twelve months, from performing this type of work and from directly or indirectly soliciting Optimas's customers with which they worked, including Customer A. In their new roles with Wurth, the Individual Defendants are trading off of relationships built by Optimas and to which they were only exposed as a result of their Optimas employment. All are using and will use Optimas's confidential and proprietary pricing, margins, supplier, and other information on Wurth's behalf, in direct violation of their Agreements.

12. Following their departures, Optimas also forensically imaged and have begun to analyze their computers and other devices. In so doing, Optimas uncovered significant evidence of trade secret misappropriation by Grimes and Kuntz, already.

13. Given their positions with Wurth and the evidence that Optimas has uncovered to date of Grimes's and Kuntz's misappropriation, Optimas is threatened and is suffering irreparable harm based on the Defendants' actions.

14. Before Optimas's customer relationships and confidential and trade secret information, including with Customer A, are further eroded, Optimas seeks injunctive relief to protect the intrinsic value of its customer relationships, confidential information, and goodwill.

4

15.     Optimas seeks to enjoin the Individual Defendants from: (1) directly or indirectly breaching the Agreements; (2) utilizing or disclosing Optimas's confidential and trade secret information; (3) possessing Optimas's confidential and proprietary information; and (4) continuing their employment with Wurth in their current, directly competitive position. Optimas also seeks to enjoin Wurth from inducing the Individual Defendants to do any of the above or to possess or use Optimas's confidential and trade secret misappropriation.

16.     Optimas also seeks all of the damages it has suffered as a result of Defendants' actions and Optimas's efforts to recover and protect its trade secrets, confidential information, and/or proprietary information and long-standing and near permanent customer relationships.

## PARTIES

17.     Optimas OE Solutions, LLC ("Optimas") is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Glenview, Illinois.

18.     Adam Grimes worked for Optimas starting in August 2002 until January 3, 2020. Grimes is domiciled in and a citizen of Columbus, Indiana.

19.     Jamie Kuntz worked for Optimas starting in August 1999 until January 3, 2020. Kuntz is domiciled in and a citizen of Columbus, Indiana.

20.     Gerry Abraham worked for Optimas starting in July 2002 until January 3, 2020. Abraham is domiciled in and a citizen of Columbus, Indiana.

21.     Wurth Group of North America Inc. is a Delaware corporation, headquartered in Ramsey, New Jersey. Wurth Industry of North America is a division of Wurth Group and, based on online records, appears to be headquartered in Brooklyn Park, Minnesota, but it is possible that it is headquartered in Greenwood, Indiana.

5

**Jurisdiction and Venue**

22.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331, because Optimas's federal Defend Trade Secrets Act ("DTSA") claim, brought under 18 U.S.C. §1836, et seq., raises a federal question. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367.

23.     This Court has personal jurisdiction over Grimes, because he has conducted business in the State of Illinois and because he has committed tortious acts within this State, pursuant to 735 ILCS 5/2-209(a)(1) and (2). In particular, as an employee of Optimas, Grimes traveled into the State of Illinois on numerous occasions for purposes of meeting with and/or devising strategy pertaining to Customer A. Further, Grimes actually misappropriated and threatens to misappropriate Optimas's trade secrets which are owned by and housed electronically in Illinois. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this claim occurred in this judicial district.

24.     This Court has personal jurisdiction over Kuntz, because she has conducted business in the State of Illinois and because she has committed tortious acts within this State, pursuant to 735 ILCS 5/2-209(a)(1) and (2). In particular, as an employee of Optimas, Kuntz communicated on a nearly daily basis with her supervisor, who works out of Optimas's headquarters in Illinois. Further, Kuntz actually misappropriated and threatens to misappropriate Optimas's trade secrets which are owned by and housed electronically in Illinois. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this claim occurred in this judicial district.

25.     This Court has personal jurisdiction over Abraham, because he has conducted business in the State of Illinois and because he has committed tortious acts within this State, pursuant to 735 ILCS 5/2-209(a)(1) and (2). In particular, as an employee of Optimas, Abraham traveled into the State of Illinois on numerous occasions for purposes of meeting with and/or devising strategy pertaining to Customer A. Further, Abraham actually misappropriated and threatens to misappropriate Optimas's trade secrets which are owned by and housed electronically in Illinois. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this claim occurred in this judicial district.

26.     This Court has personal jurisdiction over Wurth, because it has committed tortious acts within this State, pursuant to 735 ILCS 5/2-209(a)(2). In particular, Wurth actually misappropriated and threatens to misappropriate Optimas's trade secrets which are owned by and housed electronically in Illinois. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this claim occurred in this judicial district.

## EVENTS GIVING RISE TO THIS ACTION

### OPTIMAS'S BUSINESS

27.     Optimas is a global leader in providing integrated supply chain solutions and engineering support focused on delivering superior engineered fasteners to worldwide leading companies. While Optimas's business is mainly focused on the manufacturing and distribution of fasteners to customers that include the commercial trucking, agricultural, automotive, heavy equipment, HVAC, lawnmower, healthcare, medical device, and other industrial segments, it also manufactures and distributes a number of other c-class, standard fasteners products and

distributes MRO products (i.e., Maintenance, Repair, and Operations products, or essentially anything associated with repairing or maintaining a product which does not go into the product).

28.     In conducting its fastener business, Optimas both manufactures fasteners, and also utilizes hundreds of suppliers, worldwide, to manufacture fasteners that Optimas then distributes to its clients.

29.     In June 2015, Anixter Inc. divested its fasteners division, which resulted in Optimas being formed. Through this spin-off, the Individual Defendants and approximately 1000 other former Anixter fastener-division employees joined Optimas.

30.     As a company, Optimas generally sells directly to customers and rarely through other channels. Optimas's customers in turn incorporate the Optimas part into an end product or a component of an end product. For example, an Optimas bolt may be incorporated into an engine that will be placed in an 18-wheeler heavy-duty truck or an Optimas screw may be incorporated into the brakes of an 18-wheeler heavy-duty truck engine.

31.     A large percentage of Optimas's North American business is conducted through signed contracts, which tend to last for several years. Through these contracts, Optimas stocks custom inventory for most customers. Moreover, because these contracts are extensively negotiated, Optimas almost never sells products for list price, rather pricing, rebates, quantity, and other contractual terms will dictate the price at which Optimas sells fasteners to customers, including Customer A. In other words, customer pricing is not standard and Optimas protects the secrecy of its pricing with its customers, including through using non-disclosure covenants in its contracts with its customers and suppliers, including using such with Customer A.

32.     In this industry, while contracts tend to be multi-year in length, the contract cycle to win a contract takes approximately 18 months and typically starts within a year after a contract is signed with a customer.

33.     Moreover, such contracts are generally demand driven and are not requirement contracts, meaning that a customer has no obligation to purchase a set amount and such contracts are not necessarily exclusive. This results in customers continuously bidding individual parts to Optimas's competitors to drive down the cost with Optimas or to leave Optimas for a competitor for those parts, and further heightens the importance of Optimas's contract terms and confidential information.

34.     One of Optmas's largest customers and a company with which Optimas has had a 35-year relationship is Customer A. Customer A is a significant engine and power generation company. Optimas enters into multiyear contracts, and supplies products to Customer A throughout the world. The purchases that Customer A makes from Optimas accounts for tens of millions of dollars in sales on a yearly basis.

35.     Because of the importance of this relationship to Optimas's success as a company, Optimas employed the Individual Defendants (and others) to manage and oversee the relationship with Customer A, with those employees almost exclusively worked with Customer A on Optimas's behalf.

36.     In Grimes last role with Optimas, a job he held for at least the last five years of his Optimas employment, Grimes served as Optimas's Program Manager for Customer A. In this role, Grimes was responsible for, among other things:

        a.      Driving all aspects of Optimas's business with Customer A;

        b.      Managing the profitability of business with Customer A;

c.      Identifying the financial sales forecast for Customer A on a yearly basis, including providing internal reports to Optimas's leadership group throughout the year;

d.      Participating in contract negotiations with Customer A;

e.      Identifying and properly quantifying new business opportunities with customers;

f.      Thoroughly understanding customer needs and providing strategic solutions, including leading a cross-departmental team to meet and exceed customer expectations;

g.      Providing customer and sales support and working very closely with Customer A to understand and respond to customer inquiries and requests;

h.      Partnering with Customer A to ascertain and understand current technical needs to ensure that product specification meets customer demands;

i.      Understanding financial challenges of Optimas as it relates to managing and supplying Customer A's business;

j.      Working with Optimas's internal engineering team to develop solutions to technical needs of Customer A; and

k.      Developing business, logistic, sales, and other internal strategies to ensure that Optimas maintains and grows business with Customer A.

37.    In Kuntz's last role with Optimas, she served as a Strategic Business Analyst, specifically tasked with working with Customer A on Optimas's behalf. In this role, she was responsible for, among other things:

a.      Executing a range of sales-reporting functions designed to achieve a high

10

level of client service and satisfaction;

b.      Preparing sales report and analyzing data;

c.      Working effectively with cross-departmental teams to ensure sales activities stayed on schedule;

d.      Assisting in the development and refinement of robust sustainable process and practice for price increase activity;

e.      Resolving item pricing questions and problems;

f.      Performing weekly margin review for changes in cost or price and working with Grimes to adjust as appropriate;

g.      Reviewing inventory positions to ensure that gap and expedited purchases are minimized;

h.      Working with Customer A to review parts that have become obsolete and help develop a draw-down plan;

i.      Developing reports by gathering and analyzing business techniques to be used in business planning and strategic development;

j.      Synthesizing data and identifying data integrity issues through operations and financial analysis to drive performance;

k.      Tracking cost savings, rebate programs, and material surcharge credits; and

l.      Working with Customer A to resolve ad hoc requests, which required Kuntz to utilize her knowledge of Optimas's systems and departmental processes.

38.     In Abraham's last role with Optimas, he served as a Customer Application Engineer, specifically tasked with working with Customer A on Optimas's behalf. In this role, he was responsible for, among other things:

  a. Providing consultation and technical direction to Optimas's engineering team;

  b. Providing flexible engineering support, including Value-Added/Value Engineering (VA/VE), bills of material (BOM) validation, line trials, and launch support;

  c. Managing multiple products at once, while working cross-departmentally with Engineering, Purchase, Quality, New Part Introduction, and Operations teams, both within Optimas and with Customer A;

  d. Advising Customer A on new fasteners required for new design projects;

  e. Rationalizing part profiles to establish standardization, where possible;

  f. Generating engineering-based VA/VE proposals to achieve contractually-required target savings;

  g. Providing logistical support on product launches;

  h. Completing line trials, in accordance with strategic and product launch plans;

  i. Leading technical reviews of engineering products; and

  j. Assisting Optimas in developing new product launches and conducting face lifts of existing products.

39.     Through their roles, the Individual Defendants had direct access to, reviewed, and helped generate Optimas's confidential and trade secret information, relating to supplier pricing

information that Optimas received from its confidential supplier sources, the identity of its confidential supplier sources, the prices that Optimas ultimately charged its customers (including Customer A), new product launch initiatives, product mix refinement strategies, sheltered income—based on Optimas's privately manufactured products—cost reduction strategies, inventory numbers at various locations throughout the country for Customer A, product usage, internal profit and loss data, margins, and other business strategies in managing Customer A's account. This information is either not shared outside of Optimas or is otherwise confidential or both, based on confidentiality agreements and non-disclosure obligations in place through Optimas's contracts with Customer A, and others.

40.     In addition to the information identified above, Abraham was heavily involved in Optimas's VA/VE program, through which and based on contractual requirements in Customer A's contract, Optimas is required to identify and find cost savings measures. Through this and as part of a team of three engineers, Abraham was required to find engineering solutions which would help reduce Customer A's costs. Many times, the solutions (or rejected solutions) are the byproduct of months of testing and analysis, which require Optimas to expend significant time and money to develop, are highly confidential to Optimas, and are not shared externally.

41.     Further, based on Grime's role, he also had particular insight into Customer A's business and Optimas's ongoing support of that business, including knowing all of the hundreds of suppliers Optimas uses and the precise amount of fasteners each supplier supplies to support Customer A's business, who the key suppliers are, how suppliers supply products into Customer A's plants, where excess or obsolete inventory is located, where global opportunities exist, Optimas's business globally, as well as being involved in Optimas's engineering work with Customer A.

13

42. In other words, the Individual Defendants had direct access to the very information that drives Optimas's success as an organization overall and specifically with Customer A. They are and were aware of the precise parts for which Optimas was earning profits and the precise profits, as well as the products on which Optimas was taking losses and the precise losses.

43. Further, given the current ongoing contract negotiations, Grimes, in particular, was heavily involved in Optimas's contract negotiations with Customer A, including participating in a face-to-face meeting with Customer A in Illinois in February 2019. Grimes also attended several meetings between Optimas's CEO and other leadership regarding the relationship with Customer A and the ongoing contract negotiations in May, August, and September 2019.

44. Because of the Individual Defendants' intimate knowledge of Optimas's business with Customer A and Customer A's business nationally, the Individual Defendants are uniquely positioned to cause Optimas maximum harm, because, not only do they have significant customer relationships with Customer A, but they also understand Optimas's vertical and horizontal integration strategies and how Optimas sources and distributes its products to Customer A.

45. All of this information that Optimas provided to the Individual Defendants is and was highly confidential and was only provided to them and others on a need-to-know basis. The value of the information to Optimas is invaluable as such financial and business strategy information is one of the primary immediate and long-term drivers of Optimas's success as a company.

14

**OPTIMAS'S PROTECTION OF ITS CONFIDENTIAL INFORMATION AND TRADE SECRETS**

46. Because of the critical nature of Optimas's confidential and trade secret information and how it allows Optimas to succeed, Optimas closely guards its confidential information and trade secrets, and takes specific measures to restrict access to and preserve the confidentiality of this information, including, but not limited to, the following:

a. Requiring employees to sign agreements containing covenants designed to maintain confidentiality and to return Optimas's property upon resignation or termination;

b. Requiring its employees to maintain the confidentiality of Optimas's information;

c. Restricting access to computerized information through the use of passwords and a password-protected share drive on its VPN network;

d. Prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive or other media) and electronic transmission of such information (via email or other means);

e. Restricting access to computerized company information based on each individual employee's "need to know" the particular information; and

f. Entering into non-disclosure covenants with its suppliers and customers to restrict what information, if any, regarding this relationship may be disclosed to third parties.

47. Optimas rigorously maintains the confidentiality of its information because the information provides Optimas a competitive advantage in the marketplace from which Optimas derives economic value.

48.     Any Optimas competitor—including the Individual Defendants and Wurth—who possessed and used this confidential information, particularly about Optimas's: (a) customer needs and preferences; (b) pricing and margin information; (c) specifically-negotiated rebate and cost-down programs; (d) information contained within Optimas's confidential bid submissions to its customers and prospective customers; and (e) other sensitive, non-public information about Optimas, its business, its customers, and its employees, would gain an immediate and unfair competitive advantage.

49.     This is so because, among other improper advantages, it would enable them to: (1) develop trade secret and confidential and proprietary information without expending any time or resources, let alone the same degree of time and resources that Optimas did; (2) quickly develop pricing strategies and services to unfairly compete with Optimas in order to diminish or erode Optimas's marketplace standing and customer relationships; (3) discover initiatives that should not be pursued; and (4) benefit from a customer relationship which started while at Optimas.

## THE INDIVIDUAL DEFENDANTS' EMPLOYMENT WITH & CONTRACTUAL OBLIGATIONS OWED TO OPTIMAS

50.     Grimes's employment with Optimas began in or about August 2002. The last position that Grimes held with Optimas was as the Program Manager for Customer A.

51.     Kuntz's employment with Optimas began in or around August 1999. The last position that Kuntz held with Optimas was as a Strategic Business Analyst for Customer A.

52.     Abraham's employment with Optimas began in or around July 2002. The last position that Abraham held with Optimas was as a Customer Application Engineer, focusing mainly on identifying engineering solutions for Customer A.

53.     As a function of their positions, Optimas gave the Individual Defendants access to Optimas's confidential and proprietary information, and Optimas also entrusted them with its highly valuable customer relationship with Customer A. Due to Optimas's relationship with Customer A, the Individual Defendants were some of Optimas's most valued employees within the organization.

54.     Through the trust and repose Optimas (and before it, Anixter) placed in them, Grimes, Kuntz, and Abraham were exposed to and formed business relationships with Optimas's customers, including Customer A, and were exposed to and helped develop, on Optimas's behalf, confidential information regarding such customers, including Customer A.

55.     Moreover, due to Grimes's position within Optimas, Optimas provided him with a retention bonus of $30,000 in October 2017, which would have fully vested on October 31, 2020. Because Grimes left Optimas's employment before October 31, 2020, he is required to repay the retention bonus within 15 days of his departure date, which, as of the date of filing this complaint, he has not done. A true and correct copy of Grimes's Retention Bonus Agreement is attached as Exhibit 4.

56.     Each of the Individual Defendants signed a version of a Confidentiality and Non-Solicitation Agreement (the "Agreement"), with Kuntz and Abraham signing the Agreement on March 22, 2010 and May 3, 2010, respectively. Because of the divestiture with Anixter, Anixter assigned to Optimas the Kuntz and Abraham Agreements. Grimes later signed the same Agreement with Optimas on August 19, 2016. True and correct copies of the Agreement were previously attached as Exhibits 1 through 3.

57.     The Agreements require all of the Individual Defendants to:

not use or disclose to any person or entity, directly or indirectly, other than in the regular and proper course of the Company's business, any confidential or

17

> proprietary information, knowledge or data about the Company's business, is not in the public domain, learned or obtained by Employee while employed by the Company, concerning prices paid and arrangements made with suppliers, prices obtained and margins earned from customers, customer lists, key decision makers and contacts at customers, budges and sales, marketing or vendor strategies, information concerning prospective customers, quotations, bids or proposals to customers and prospective customers, employee information, compensation structures, bonus or other incentive program information or any other information, knowledge or data, the use of disclosure of which might harm the Company (all of the foregoing referred to herein collectively as "Confidential and Proprietary Information"), except as required by law …

(Agreements, §1.) Moreover, pursuant to the Agreement, the Individual Defendants were required to return all Confidential Information to Optimas upon the termination of their employment.

58. Pursuant to the terms of the Agreement, the Individual Defendants also agreed that:

> The protection of the Company's customer and business relationships is essential and the Company has expended substantial amounts of time, effort and money to build and maintain these relationships. Accordingly, Employee shall not, either directly or indirectly, solicit or attempt to solicit any customer of the Company for products, components or services that are provided by the Company, nor shall Employee assist others with respect to such activities, for a period of twelve (12) months after Employee's termination of employment with the Company, whether that termination be voluntary or involuntary. This restriction shall apply to all customers (a) that were assigned to Employee within Employee's last twenty-four (24) months of employment, (b) for which Employee received a commission or bonus within Employee's last twenty-four (24) months of employment, or (c) for which Employee had direct or indirect supervisory or management responsibility within Employee's last (24) months of employment.

(Agreements, §3.)

59. In executing the Agreements, the Individual Defendants acknowledged that "[t]he restrictions contained in this Agreement are necessary to protect the Company's valuable information and business interests, and the restrictions are reasonable for such purpose." (Id., §6.) The Agreements also contain Illinois choice-of-law provisions. (Id., §9.)

18

**DEFENDANTS BAD ACTS**

60.    In 2019, Customer A told Optimas that it intended to bid out certain aspects of the fasteners contract. Over the course of that year, Optimas and Grimes met both extensively internally and with Customer A, to discuss this bid, Optimas's business with Customer A, and Optimas's bid.

61.    One of the companies that was invited to bid on the business was Wurth, which had been trying, unsuccessfully, to displace Optimas as Customer A's fastener supplier for years.

62.    It is anticipated that Customer A will be announcing which company or companies successfully won a portion of this bid within the coming weeks.

63.    On December 20, 2019, the Individual Defendants separately announced their intent to depart from Optimas, providing two weeks' notice with a departure date of January 3, 2020. True and correct copies of the resignation letters are attached as Exhibit 5 through 7.

64.    In their resignation letters, none of the Individual Defendants disclosed with what company they would be taking employment. However, upon learning of the announced resignation, Grimes' direct supervisor, Cliff Harris, spoke with Grimes over the phone. During that conversation, Grimes told Harris that he had been solicited to leave Optimas for Wurth. When Harris asked Grimes what Optimas could do to keep him, Grimes told Harris that Wurth had offered to nearly double his salary and, because of that, Grimes would not consider a counteroffer from Optimas.

65.    During this conversation, Harris told Grimes that he believed that, due to Grimes's Agreement, Grimes could not take a position with Wurth in which Grimes would be soliciting Customer A. In response, Grimes told Harris that: (a) Grimes had disclosed his

19

Agreement to Wurth; and (b) Wurth intended to put him in a position in which he was not competing.

66.     Despite this representation, based on facts discussed below, this representation appears to be inaccurate.

67.     Additionally, based on Optimas's understanding of Grimes's relationship with Kuntz (Optimas is informed and believes that Grimes and Kuntz are married in common law), Optimas understood from its conversation with Grimes that approaching Kuntz about remaining at Optimas would also be unsuccessful.

68.     Optimas's attempts to retain Abraham were also unsuccessful.

69.     Because Optimas and Wurth are fierce competitors, upon learning that it could not retain the Individual Defendants, Optimas cut off the Individual Defendants' access to Optimas's network and required them to turn in their devices and other Optimas property, but Optimas did continue to pay them through their two weeks' notice.

70.     Additionally, because the Individual Defendants informed Optimas that they were going to Wurth, and despite Grimes's representation about his role with Wurth, Optimas sent the Individual Defendants cease and desist letters during the week of December 27th. In sending the letters, Optimas also sent copies of the letters to Wurth. True and correct copies of the cease and desist letters are attached as Exhibit 8 through 10.

71.     On December 30, 2019, Optimas, through outside counsel, also sent a cease and desist letter to Wurth, through which Optimas requested that Wurth abide by the terms of the Agreements, not place the Individual Defendants in positions in which they would improperly solicit, directly or indirectly, Optimas's customers, and demanded that Wurth prohibit the

Individual Defendants from improperly using Optimas's confidential information. A true and correct copy of the letter Optimas sent to Wurth is attached as Exhibit 11.

72.     None of the Defendants responded to Optimas's letter.

73.     Moreover, on January 8, 2020, Grimes updated his LinkedIn profile to announce that he was now employed by Wurth and would be operating as the Program Manager, on Wurth's behalf, for Customer A. This means that, despite Grimes's representation about Wurth placing him in a role that would not cause him to breach his Agreement, Grimes is directly and unfairly soliciting and competing with Optimas and working improperly with Customer A.

74.     As a result of this, Optimas decided to forensically image the devices of the Individual Defendants to determine whether, in addition to breaching their Agreements, they also misappropriated Optimas's trade secrets.

75.     While this investigation is not yet complete, to date, what Optimas has uncovered is chilling. Indeed, in imaging Grimes's and Kuntz's computers, they have uncovered what appears to be substantial and deliberate trade secret misappropriation.

76.     Specifically, in imaging Kuntz's Optimas computer, Optimas discovered that, beginning in late August 2019, Kuntz began saving highly sensitive files into a folder named "Add to Flash Drive Nov."

77.     In particular, on August 27, 2019, she created the folder "My Computer\Documents\Add To Flash Drive Nov." Later that same morning she created a subfolder in this folder named: "My Computer\Documents\Add To Flash Drive Nov\Reports for Scott, Adam."

78.     On information and belief, the "Adam" referenced is Adam Grimes, and the "Scott" referenced is "Scott McDaniel." What makes this all the more diabolical is that it appears

to also implicate a former Optimas, and now-Wurth employee, Scott McDaniel, who Optimas sued in May 2017 in order to ensure that he abided by his agreement.

79.     Over the course of the next several months, hundreds, if not thousands of documents were added to the "Add to Flash Drive Nov" folder, with the documents dealing with extremely sensitive information pertaining to Customer A, including information relating to the parts Optimas sells Customer A, the contract negotiations, historic contract information, excess and obsolete training, information pertaining to products not used in various prior calendar years and 2019, information pertaining to the forecasting accuracy that Optimas achieved, margin information, parts having negative margins, demand planning documents, price files, business review PowerPoint presentations made to Customer A, new pricing made as a result of new tariffs, sales quantities by plant for 2016-2019, vendor names by import part, VA/VE reports from 2014 to present, copies of contract pricing for 2019, fuel price lists, critical part lists, price changes for cost savings lists, vendor names and part number lists, sales by plant for Customer A for 2017-2019, parts to quote as part of Optimas's bid, market test reports, 2020 planning documents for Optimas's bid and contract work for Customer A, notes from Optimas's meetings with Customer A, freight bill tracking documents, and other highly sensitive documents.

80.     Put simply, Kuntz was absolutely not authorized to and was not directed to collect or download these documents onto external media devices. The document categories identified above were developed by Optimas over many years and at significant cost to Optimas. These are the precise types of documents of which Optimas takes such strenuous efforts to prevent disclosure, and these documents constitute some of Optimas's most important trade secrets, which allow Optimas to maintain its competitive advantage, particularly in servicing and retaining Customer A's business.

81.     Consistent with her efforts to misappropriate Optimas's most sensitive information regarding Customer A, Optimas's forensic investigation uncovered that, also starting on August 27, 2019 and continuing through December 20, 2019, Kuntz inserted three separate external media devices into her computer at varying times between those dates (none of which she returned). Specifically, Optimas determined that the following devices were plugged into Kuntz's Optimas-issued computer on the following dates:

| Description | Serial No. | First Connected | Last Connected | Last Disconnected |
|---|---|---|---|---|
| Lexar USB Flash Drive USB Device | D3AC3400341A26791247 | 8/27/19 9:21 | 10/15/19 12:39 | 10/15/19 12:44 |
| San Disk U3 Cruzer Micro USB Device | 00016A7111C1168C | 9/3/19 14:48 | 12/13/19 20:22 | 12/13/19 20:22 |
| Lexar USB Flash Drive USB Device | AAMKMBGT6BAPDHGL | 12/20/19 14:00 | 12/20/19 14:10 | 12/20/19 14:10 |

82.     While forensic evidence can capture first connected and last connected dates, there is no way to determine how many times she inserted the various devices into her Optimas-issued laptop over those months.

83.     On information and belief, Kuntz transferred the contents of the "Add to Flash Drive Nov" folder to one or more of the above flash drives between August 27, 2019 and December 20, 2019 for purposes of using such Optimas trade secret information on Wurth's behalf.

84.     In this same timeframe, Grimes inserted five separate external media devices into his Optimas-issued computer (none of which he returned ). Those devices included:[1]

---

[1] There are two other instances in which Grimes inserted devices into his Optimas computer, once on January 31, 2019 and March 14, 2019, but, at this time, Optimas has no reason to

23

| Description | Serial No. | First Connected | Last Connected | Last Disconnected |
|---|---|---|---|---|
| USB Disk 20 USB Device | 070823F48620BD84 | 12/16/19 14:12 | 12/16/19 14:12 | 12/16/19 14:16 |
| General UDisk USB Device | 6&929e142 | 2/7/19 7:23 | 12/16/19 14:33 | 12/16/19 16:11 |
| General UDisk USB Device | 6&320afaa4 | 10/1/19 12:14 | 10/1/19 12:16 | 10/1/19 12:16 |
| Lexar USB Flash Drive USB Device | AAC3E4371PEEQCTU | 1/31/19 22:22 | 12/20/19 9:25 | 12/20/19 10:56 |
| Seagate FreeAgent USB Device | 2GET7J7D | 8/16/19 15:56 | 12/20/19 9:07 | 12/20/19 16:36 |

85.     While these devices were plugged in, Grimes accessed a series of documents that, if downloaded and used, would provide Wurth a virtual roadmap to allow it to unseat Optimas as Customer A's fastener supplier. These documents include:

| File Path | Access Time |
|---|---|
| \\axe\ns\AF1_SERVICE_CENTERS\LOCATION_059\Resourcing\APQP & Resource Files\2019 APQP\APQP 2019 Tracking..xls | 12/20/19 11:06 |
| \\axe\ns\AF1_SERVICE_CENTERS\LOCATION_059\Resourcing\APQP & Resource Files\2019 APQP | 12/20/19 11:06 |
| \\axe\ns\AF1_SERVICE_CENTERS\LOCATION_059\Resourcing\APQP & Resource Files\2019 APQP\APQP 2019 Tracking..xls | 12/20/19 11:06 |
| \\axe\ns\AF1_SERVICE_CENTERS\LOCATION_059\Resourcing\APQP & Resource Files\2019 APQP | 12/20/19 11:06 |
| C:\Users\e209259\Desktop\PCR form C-182086.xlsx | 12/20/19 11:04 |
| C:\Users\e209259\Downloads\Buy request_C-182086 (3).xlsx | 12/20/19 11:01 |
| C:\Users\e209259\Desktop\PCR form C-182086.xlsx | 12/20/19 11:00 |

suspect that such use, at that time, was associated with tortious activity, though Grimes did not return these devices either, and Optimas expects that its confidential information resides on these devices. Accordingly, while Optimas does not claim trade secret misappropriation through this use, it does seek the return of these devices, to the extent they contain Optimas information.

| | |
|---|---|
| C:\Users\e209259\Downloads\PCR form C-182086.xlsx | 12/20/19 10:59 |
| C:\Users\e209259\Downloads\Q1 2020 Top 30 Customers v12-20.xlsx | 12/20/19 10:56 |
| F:\2019 RFQ Tracker.xls | 12/20/19 9:25 |
| Z:\1 - Master Parts Folder\5564479\5564479  2019\5564479 new rfq 12-16-19 | 12/20/19 9:24 |
| Z:\1 - Master Parts Folder\5564479\5564479  2019\5564479 new rfq 12-16-19\Optimas Quote  5564479  for 57 pcs  12-18-19.pdf | 12/20/19 9:24 |
| \\axe\ns\AF1_SERVICE_CENTERS\LOCATION_059\Team NBI\Kyle [CUSTOMER A] BCM 2019.xlsx | 12/20/19 9:22 |
| \\axe\ns\AF1_SERVICE_CENTERS\LOCATION_059\Team NBI | 12/20/19 9:22 |
| C:\Users\e209259\Downloads\Buy request_C-182086 (2).xlsx | 12/20/19 9:17 |
| C:\Users\e209259\Downloads\Buy request_C-182086 (1).xlsx | 12/20/19 9:11 |
| C:\Users\e209259\Downloads\Buy request_C-182086.xlsx | 12/20/19 9:10 |
| D:\Accounts.xls | 12/16/19 16:11 |
| Z:\1 - Master Parts Folder\5564479\5564479  2019\5564479 new rfq 12-16-19 | 12/16/19 15:01 |
| D:\off.xls | 12/16/19 14:16 |
| D:\Ativa_flash_drv_stmnt.pdf | 12/16/19 14:16 |
| D:\FSA\6.29.12.. 105.39.pdf | 12/16/19 14:15 |
| D:\All Spread Sheets\PushOut.xls | 12/16/19 14:14 |
| D:\All Spread Sheets\Doc1.doc | 12/16/19 14:14 |
| D:\All Spread Sheets\Launch Status 03_18_2009.xls.zip | 12/16/19 14:12 |
| D:\All Spread Sheets\Jamie..xls | 12/16/19 14:12 |

86.    Moreover, Optimas has determined, through its forensic investigation, that Grimes actually accessed a series of Optimas trade secret information from external media devices, indicating that such files were on such external media devices at that time. Those files include:

| Timestamp (EST/EDT) | Event Type | File Path |
|---|---|---|
| 12/19/2019 10:32 | File Opened/Accessed | F:\2019 [Customer A] LTA\10.18.19 first red line LTA sent to [Customer A]\ [Customer A] LTA 10.18.19.zip |

| | | |
|---|---|---|
| 12/18/2019 11:29 | File Opened/Accessed | F:\2019 [Customer A] LTA\10.16.19 E&O and LTA\[Customer A] LTA Based on 9.23 Discussion v5ps.docx |
| 12/16/2019 10:03 | File Opened/Accessed | D:\Confidentiality and Non Solicitation and other docs\Confidentiality and Non-Solicitation Agreement.doc |
| 12/12/2019 14:58 | File Opened/Accessed | D:\2019 Global Sales\[Customer A] YTD Sales November 2019.xlsx |
| 12/12/2019 14:39 | File Modified | D:\ [Customer A] Sales by Plant 2017, 2018, 2019.xls |
| 12/12/2019 14:39 | File Opened/Accessed | D:\ [Customer A] Sales by Plant 2017, 2018, 2019.xls |
| 12/12/2019 13:58 | File Modified | D:\2019 Global Sales\[Customer A] YTD Sales November 2019.xlsx |
| 12/12/2019 13:58 | File Created | D:\2019 Global Sales\[Customer A] YTD Sales November 2019.xlsx |

87. Like the documents that Kuntz appears to have misappropriated, Grimes was absolutely not authorized to download these documents onto external media devices. The documents identified above were developed by Optimas over many years and at significant cost to Optimas. These are the precise types of documents of which Optimas takes such strenuous efforts to prevent disclosure, and these documents constitute some of Optimas's most important trade secrets, which allow Optimas to maintain its competitive advantage, particularly in servicing and retaining Customer A's business.

88. On information and belief, based on Kuntz's creation of the subfolder "Reports for Adam, Scott" during this time frame, at some time in August 2019, Scott McDaniel, on Wurth's behalf, successfully solicited the Individual Defendants to leave Optimas for Wurth. Over the course of the next nearly four months, the Individual Defendants began collecting and

26

downloading Optimas's confidential and trade secret information regarding Customer A, in an effort to aid their former colleague, McDaniel, and their new employer, Wurth, to unfairly bid on, obtain, and service portions of Customer A's business, now for Wurth.

89.     Optimas has, as of the filing of this complaint, been unable to image and analyze Abraham's Optimas-issued computer (due to a corrupted encryption key). However, despite that, based on the timing of Abraham's departure, his taking the same position with Wurth, and his having previously worked with McDaniel, Optmas is informed and believes that Abraham has also actually misappropriated Optimas's trade secrets and that he is threatening to and will actually use Optimas's trade secrets in performing his new job for Wurth.

90.     As a result of these activities, and Wurth's and the Individual Defendants' ongoing unfair competition, tortious acts, and breaches of contract, Optimas is being irreparably damaged, with its confidential and trade secrets at significant risk, its customer relationship with Customer A at significant risk, and its goodwill being damaged.

## EFFECT OF THE DEFENDANTS' CONDUCT

91.     With the departure of the Individual Defendants, and their knowledge of Optimas's confidential information and their significant access to Customer A, Optimas stands to lose millions of dollars in business as well as losing the value of its goodwill, customer relationships, trade secrets, and confidential and proprietary information, which cannot be adequately addressed at law.

92.     During their employment with Optimas, the Individual Defendants were exposed to and helped develop Optimas's confidential and trade secret information related to Optimas's customers and offerings, including selling strategies, confidential information relating to

customer's preferences, pricing respecting Optimas's products and services, as well as other information identified above.

93.    The Individual Defendants, through their employment with Wurth, are now in a position where there is no scenario that Optimas's confidential and trade secret information and customer relations do not get used, particularly as it relates to Customer A, which would certainly erode Optimas's standing in the fasteners market, potentially costing Optimas a loss of business valued in the millions of dollars. Optimas's confidential information and customer relationships, however, are invaluable, the loss of which would provide an immediate benefit to Wurth, and an equally immediate irreparable detriment to Optimas's business.

94.    By definition of their positions with Wurth and their possession of Optimas's trade secrets, the Individual Defendants have used, threaten to use, and will inevitably disclose Optimas's confidential, proprietary, and trade secret information. None of the Individual Defendants can perform their jobs for Wurth without violating their Agreements and without using Optimas's trade secrets and confidential information.

95.    Based on the information currently in Optimas's possession, the Individual Defendants are, and will continue to attempt to, sell competing Wurth products to Customer A.

96.    Wurth's decision to hire the Individual Defendants and its continued solicitation of Customer A poses harm to Optimas far beyond just significant monetary losses.

97.    Defendants will have an unfair advantage in targeting Optimas's customers and developing marketing and sales plans and strategies based on Optimas's successes and rejected plans as well as the bids Optimas provided to its customers, including Customer A. The Individual Defendants will have valuable know-how on how to design and improve Wurth's own services, customer relationships, and goodwill.

28

98.     All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Optimas, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer relationships, loss of goodwill, as well as damage to Optimas's reputation as an industry leader and its ability to successfully market its goods and services. Money alone cannot make Optimas whole.

**COUNT I**
**BREACH OF CONTRACT**
**(AGAINST THE INDIVIDUAL DEFENDANTS)**

99.     Optimas hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 98.

100.    The Agreements that the Individual Defendants executed constitute valid and enforceable agreements.

101.    Optimas performed all of the duties and obligations it agreed to and owed to the Individual Defendants under the Agreements, as well as the obligations Grimes owes Optimas under the Retention Bonus Agreement.

102.    Under the Agreements, the Individual Defendants are required not to solicit Customer A for products, components or services that are provided by Optimas or assist any other company, including Wurth, in doing the same. The Individual Defendants are also prohibited from taking or using Optimas's confidential information. (See Exs. 1-3.)

103.    In breach of the Agreements, the Individual Defendants have taken positions with Wurth requiring them to directly solicit or assist others in soliciting Customer A's business.

104.    In breach of the Agreements, the Individual Defendants have disclosed and used Optimas's confidential and trade secret information.

105. Because of the Individual Defendants' breaches and prospective breaches, Optimas has been irreparably injured and continues to face irreparable injury. Optimas is threatened with losing the value of its confidential and proprietary information and its customer relationship with Customer A, along with income and goodwill, for which a remedy at law is inadequate.

106. Accordingly, the Individual Defendants must be enjoined and restrained by Order of this Court. In addition to a remedy at equity, Optimas seeks actual, incidental, compensatory, punitive, and consequential damages.

## COUNT II
## THREATENED OR INEVITABLE MISAPPROPRIATION OF TRADE SECRETS
## (ILLINOIS UNIFORM TRADE SECRET ACT)

107. Optimas hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 98.

108. Optimas's confidential and proprietary information includes, *inter alia*, Optimas's: (a) customer needs and preferences; (b) pricing and margin information; (c) product development, cost savings strategies, contract negotiation, and long-term strategies; (d) information contained within Optimas's confidential bid submissions to its customers, including Customer A; (e) supplier relationships, pricing, and other supplier-specific information; (f) technologies and product development pipeline; and (g) other sensitive, non-public information about Optimas, its business, its customers, and its employees.

109. This information constitutes trade secrets, pursuant to the Illinois Uniform Trade Secret Act, 765 ILCS 1065/1, *et seq.*, because Optimas derives independent economic value from this information not being generally known to the public and not being readily ascertainable by

30

proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

110.     Defendants actually have misappropriated, threaten to misappropriate, or will inevitably disclose Optimas's trade secrets without its consent, in violation of Illinois law. As discussed above, the Individual Defendants cannot maintain similar and/or identical positions at Wurth without the Individual Defendants inevitably utilizing and disclosing Optimas's confidential and trade secret information.

111.     Specifically, as discussed above, the Individual Defendants are using and disclosing or will use and disclose Optimas's trade secrets relating to, at a minimum, its pricing, margins, supplier information, product development, marketing, sales, and business strategies, customer relationship and customer preference information, and overall Optimas strategies, particularly as they relate to Customer A, to unfairly compete against Optimas, all information which the Individual Defendants received based on their work with Optimas. Further, Wurth knows or should know that the information the Individual Defendants have and are using are Optimas's trade secrets.

112.     The Defendants' actions are willful and malicious.

113.     Defendants are being or will be unjustly enriched by their misappropriation of Optimas's trade secrets and, unless restrained, Defendants will continue to use, divulge, and otherwise misappropriate Optimas's trade secrets and confidential information.

114.     Because of the actual misappropriation of Optimas's trade secrets, Optimas has been injured and faces irreparable injury. In addition to a remedy at equity, Optimas seeks actual, incidental, compensatory, punitive, consequential damages, and attorney's fees and costs.

<u>COUNT III</u>
<u>VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832, *ET SEQ.*</u>
<u>(ALL DEFENDANTS)</u>

115.    Optimas hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 98.

116.    The Defend Trade Secrets Act ("DTSA") defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. *See* 18 U.S.C. §§ 1836, 1839.

117.    Defendants acquired Optimas's trade secrets by improper means and without authorization. In particular, the Individual Defendants obtained trade secrets from Optimas through, *inter alia*, having accessed and retained Optimas's confidential information and trade secrets even after their respective resignations, including by means of improperly downloading and retaining Optimas's trade secrets on external media devices. As discussed in great length above, Optimas's forensic review identified the Individual Defendants' retention and use of Optimas's trade secret information.

118.    The information that the Individual Defendants have provided to Wurth or threaten to provide to Wurth regarding Optimas's (a) customer needs and preferences; (b) pricing and margin information; (c) product development, cost savings strategies, contract negotiation, and long-term strategies; (d) information contained within Optimas's confidential bid submissions to its customers, including Customer A; (e) supplier relationships, pricing, and other supplier-specific information; (f) technologies and product development pipeline; and (g) other

32

sensitive, non-public information about Optimas, its business, its customers, and its employees, constitutes trade secrets within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

119.    As detailed above, Optimas takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

120.    Defendants knew or should have known that Optimas's trade secrets: (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Optimas at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Optimas's competitors; (e) would provide significant benefit to a competitor seeking to compete with Optimas; and (f) are critical to Optimas's ability to conduct its business successfully.

121.    As detailed above, the Individual Defendants transferred and/or wrongfully obtained and accessed Optimas's trade secrets and failed to return Optimas's information, despite contractual obligations to return such information and requests from Optimas for Defendants to do so.

122.    By disclosing and/or threatening to disclose Optimas's trade secrets to Wurth without Optimas's consent, Defendants have misappropriated or threaten to misappropriate Optimas's trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

123.    The information that Defendants have misappropriated or threaten to misappropriate describes and relates to Optimas's highly confidential business relationship and

strategic plans, which involve products that are sold in, utilized throughout, and/or travel through interstate commerce.

124.    Should Defendants continue to disclose or threaten to disclose Optimas's trade secrets, the disclosure of such information will harm and/or threaten to harm Optimas and its legitimate business interests.

125.    Defendants' actions were willful and malicious.

126.    If information pertaining to Optimas's trade secrets are disclosed by the Individual Defendants to Wurth or other competitors of Optimas, it could destroy Optimas's competitive advantage.

127.    Because Defendants' misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, Optimas requests that this Court grant injunctive relief against Defendants from actual or threatened disclosure or utilization of Optimas's trade secrets, in addition to granting Optimas actual, incidental, compensatory, punitive, exemplary, consequential damages, and attorney's fees and costs.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT
## (AGAINST WURTH)

128.    Optimas hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 98.

129.    As set forth above, the Individual Defendants' Agreements are valid and enforceable contracts. The post-employment activity covenants, confidentiality covenants and other provisions contained in the Agreements are reasonable in scope and duration and are reasonably necessary to protect Optimas's legitimate protectable interests in its long-standing,

well established and valuable customer relationships, its confidential information, and its goodwill.

130.    Wurth was fully aware of the Individual Defendants' Agreements well before hiring the Individual Defendants, given that Wurth has previously hired Optimas employees, Grimes disclosed that he informed Wurth of his post-employment restrictive covenants, and Optimas sent a cease and desist letter to Wurth, containing copies of the Agreements, before the Individual Defendants' employment with Optimas terminated. Accordingly, no question exists that Wurth was fully aware of the Agreements and their terms.

131.    Despite having knowledge of the Individual Defendants' Agreements, Wurth intentionally induced, permitted, and incentivized the Individual Defendants to violate their post-employment—and then-current contractual obligations owing to Optimas, without justification—in an effort to employ the Individual Defendants, move Optimas's business with Customer A to Wurth, obtain Optimas's confidential information, and unfairly compete with Optimas.

132.    On information and belief, Wurth's intentional interference was malicious, unjustified and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting the Individual Defendants to breach their Agreements with Optimas, and an attempt to intentionally weaken Optimas, in an effort to acquire Optimas's business with Customer A.

133.    As a result of Wurth's intentional interference, Optimas has suffered irreparable and other significant injuries. In addition to a remedy at equity, Optimas seeks actual, incidental, compensatory, punitive, exemplary and consequential damages, and attorney's fees and costs.

## COUNT VI
## UNFAIR COMPETITION
## (WURTH)

134.    Optimas hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 98.

135.    Wurth took the foregoing acts to gain an unfair competitive advantage over Optimas.

136.    Wurth willfully undertook the foregoing acts with knowledge of and disregard for Optimas's rights, and with the intention of causing harm to and/or attempt to harm Optimas and benefiting itself.

137.    Wurth is unfairly competing in the marketplace.

138.    Wurth's actions are willful and malicious.

139.    As a result of Wurth's unfair competition, targeting Optimas's employees, targeting Optimas's customers by improperly acquiring Optimas's confidential and trade secret information, or attempting to improperly acquire Optimas's trade secrets or confidential information, and by hiring Optimas's employees *en masse*, Optimas has been injured and faces irreparable injury. Optimas is threatened with losing customers, employees, technology, its competitive advantage, its trade secrets and confidential information, and goodwill in amounts which may be impossible to determine, unless Wurth is enjoined and restrained by order of this Court. In addition to a remedy at equity, Optimas seeks actual, incidental, compensatory, punitive, exemplary and consequential damages, and attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Optimas OE Solutions, LLC seeks judgment in its favor and an Order against Defendants Adam Grimes, Jamie Kuntz, Gerry Abraham, and Wurth Group North America Inc. that grants the following relief:

A.    Temporarily, preliminarily and permanently enjoining the Defendants and all parties in active concert or participation with them, from using or disclosing any of Optimas's confidential, proprietary, and/or trade secret information;

B.    Temporarily, preliminarily and permanently enjoining the Individual Defendants from engaging in or participating in any employment or activity, insomuch as such activity is directed to or designed to solicit or divert any of Optimas's customers or potential customers that the Individual Defendants contacted, targeted or serviced, or about which they had access to confidential information while in Optimas's employ, including but not limited to Customer A;

C.    Ordering Defendants and all parties in active concert or participation with them, to return to Optimas all originals and copies of all files, devices and/or documents that contain or relate to Optimas's confidential, proprietary, and trade secret information, including without limitation, all computers, electronic media, PDA's and electronic storage devices;

D.    Ordering Defendants and all parties in active concert or participation with them, to preserve all documents, data, and electronic information and to produce for inspection and imaging all computers and other electronic storage devices and email accounts belonging to, under the control of, accessible to, or operated by the Individual Defendants;

E.    Awarding Optimas actual, incidental, compensatory, and consequential damages to be proven at trial;

F.    Awarding Optimas exemplary or punitive damages in an amount to be proven at trial due to Defendants' willful and malicious activities;

G.    Disgorging all monies received and/or paid to the Individual Defendants and/or Wurth as a result of the Individual Defendants' tortious actions relating to Optimas's customers; and

H.    Awarding Optimas such further relief as the Court deems necessary and just.

**DATED: JANUARY 13, 2020**                 Respectfully submitted,

                                            **OPTIMAS OE SOLUTIONS, LLC**


                                            By: /s/ Justin K. Beyer
                                                    One of Its Attorneys

Justin K. Beyer
Robyn E. Marsh
Seyfarth Shaw LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

*Attorneys for Plaintiff Optimas OE Solutions, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, does hereby certify that he caused a true and correct copy of the foregoing to be served upon Defendant Grimes, Kuntz, and Abraham at their home address, and upon Wurth Group North America Inc. at its corporate headquarters this 14th day of January, 2020.

/s/ Justin K. Beyer
Justin K. Beyer