UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OPTIMAS OE SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 20 C 251 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| ADAM GRIMES, JAMIE KUNTZ, GERALD | ) | |
| ABRAHAM, and WURTH GROUP OF NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum Opinion and Order**

Optimas OE Solutions, LLC brings this suit against Wurth Group of North America, Inc.,
and former Optimas employees Adam Grimes, Jamie Kuntz, and Gerald Abraham for matters
arising from their hiring and employment by Wurth. Doc. 1. The complaint alleges breach of
contract against Grimes, Kuntz, and Abraham (collectively, "Individual Defendants"); tortious
interference with contract and unfair competition against Wurth; and violations of the Illinois
Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq*., and the Defend Trade Secrets Act
("DTSA"), 18 U.S.C. § 1836 *et seq*., against all Defendants. Doc. 1. Defendants move to
dismiss for lack of personal jurisdiction under Civil Rule 12(b)(2) and improper venue under
Civil Rule 12(b)(3), or, in the alternative, to transfer the case to the Southern District of Indiana
under 28 U.S.C. § 1404(a), or, in the second alternative, to dismiss certain claims under Civil
Rule 12(b)(6). Docs. 22, 42. The motions are denied.

**Background**

In resolving the Rule 12(b)(2), Rule 12(b)(3), and § 1404(a) motions, the court considers
the complaint's well-pleaded allegations and the evidentiary materials submitted by both sides,

1

including exhibits submitted in conjunction with Optimas's preliminary injunction motion (which will be resolved in a separate opinion). *See Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016) ("[W]e have before concluded that, when considering a motion to dismiss in general, a court may consider matters outside of the pleadings to resolve factual questions pertaining to jurisdiction … ."); *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809-10 (7th Cir. 2011) ("When ruling on a motion to dismiss for improper venue, the district court is not obligated to limit its consideration to the pleadings or to convert the motion to one for summary judgment if the parties submit evidence outside the pleadings.") (internal quotation marks and alteration omitted). The court must accept Optimas's factual allegations and resolve all factual disputes in its favor. *See Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012) ("[W]here, as here, the issue [of personal jurisdiction] is raised on a motion to dismiss, the plaintiff need only make a prima facie showing of jurisdictional facts. We therefore accept as true all well-pleaded facts alleged in the complaint and resolve any factual disputes … in favor of the plaintiff.") (citation omitted); *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003); *Carter v. Baldwin*, 2017 WL 3310976, at \*1 (N.D. Ill. Aug. 3, 2017).

In resolving the Rule 12(b)(6) motion, the court assumes the truth of the complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Optimas's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013).

As to all the motions, the facts are set forth as favorably to Optimas as the materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at this stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018). Facts outside the pleadings that may be considered in support of dismissal or transfer under Rules 12(b)(2) and 12(b)(3) and § 1404(a) may not be used to support dismissal under Rule 12(b)(6).

### A.     The Parties

Optimas is a company headquartered in Glenview, Illinois. Doc. 1 at ¶ 17. Individual Defendants are Indiana citizens. *Id*. at ¶¶ 18-20. Wurth is a company headquartered in New Jersey. *Id*. at ¶ 21. Wurth Industry of North America ("WINA") is a division of Wurth. *Ibid*. Kuntz joined Optimas in August 1999, Abraham in July 2002, and Grimes in August 2002. *Id*. at ¶¶ 18-20. All three left Optimas on January 3, 2020 for jobs at Wurth. *Id*. at ¶¶ 18-20, 64, 70, 93-95.

Defendants argue that Wurth is not a proper defendant because—contrary to the complaint's allegations—WINA, not Wurth, employs Individual Defendants. Doc. 23 at 1 n.1. That argument cannot be considered in support of Defendants' Rule 12(b)(6) motion because the complaint, whose allegations must be taken as true under Rule 12(b)(6), alleges that Individual Defendants went to work for Wurth. Doc. 1 at ¶¶ 64, 70, 93-95. And as Defendants acknowledge, the argument does not materially affect their other motions. Doc. 23 at 1 n.1 (noting that the arguments Defendants offer on Wurth's behalf are "the same as those that would be offered by [WINA]").

### B.     Optimas's Business

Optimas is a provider of integrated supply chain solutions and engineering support, with a focus on delivering fasteners to worldwide companies. Doc. 1 at ¶ 27. Optimas both

manufacturers fasteners and distributes fasteners manufactured by its suppliers. *Id*. at ¶ 28. Optimas formed in June 2015 as a spin-off of Anixter Inc., when Anixter divested its fasteners division. *Id*. at ¶ 29. Optimas sells fasteners directly to its customers. *Id*. at ¶ 30. The customers incorporate Optimas's parts into their end products—for example, an Optimas bolt may be incorporated into an engine that will be placed in an 18-wheeler heavy-duty truck. *Ibid*.

A large percentage of Optimas's North American business is conducted through multi-year contracts. *Id*. at ¶ 31. The contracts are extensively negotiated, and Optimas almost never sells its products for list price, instead relying on historic pricing, rebates, quantity, and other contractual terms to set its pricing. *Ibid*. That is, customer pricing is not standard, and Optimas protects the secrecy of its pricing through non-disclosure covenants in its contracts with its customers and suppliers. *Ibid*. The cycle to win a new contract with a customer takes some eighteen months, often starting within a year after a customer signed an existing contract. *Id*. at ¶ 32. Because the contracts are typically demand-driven and non-exclusive, customers continually solicit competing offers from competitors, driving prices down. *Id*. at ¶ 33.

One of Optimas's largest customers is Cummins, a major engine and power generation company. *Id*. at ¶ 34. (The complaint refers to Cummins as "Customer A.") Optimas has enjoyed a 35-year relationship with Cummins. *Ibid*. Optimas enters into multi-year contracts with Cummins, supplying it products worldwide, and that business accounts for tens of millions of dollars of annual sales. *Ibid*.

### C.    Individual Defendants' Employment with Optimas

Optimas employed Individual Defendants to manage and oversee its Cummins business. *Id*. at ¶ 35. Individual Defendants' work at Optimas was almost entirely Cummins-related. *Ibid*.

In his last five years with Optimas, Grimes was a Program Manager for Cummins. *Id*. at ¶ 36. In this role, Grimes: (a) drove all aspects of Optimas's business with Cummins; (b)

managed the profitability of that business; (c) identified the financial sales forecast for Cummins by providing internal reports to Optimas's leadership group throughout the year; (d) participated in contract negotiations with Cummins; (e) identified and quantified new business opportunities; (f) understood Cummins's customer needs and provided strategic solutions; (g) provided customer and sales support and worked very closely with Cummins to understand and respond to customer inquiries and requests; (h) partnered with Cummins to ascertain and understand its technical needs to ensure that product specifications met its demands; (i) understood Optimas's financial challenges related to managing the Cummins business; (j) worked with Optimas's internal engineering team to develop solutions to Cummins's technical needs; and (k) developed business, logistic, sales, and other strategies to ensure that Optimas maintained and grew its Cummins business. *Ibid.* Grimes's role gave him particular insight into Optimas's Cummins business, including knowledge of: the suppliers Optimas uses to support the Cummins business and the volume of fasteners each supplier provides; how suppliers supply products to Cummins's plants; where excess or obsolete inventory is located; where global opportunities exist; and the extent of Optimas's engineering work with Cummins. *Id*. at ¶ 41. Grimes was heavily involved in Optimas's contract negotiations with Cummins, which included participating in a face-to-face meeting with Cummins in Illinois in February 2019 and attending several meetings with Optimas's CEO and other leaders concerning the Cummins client relationship in May, August, and September 2019. *Id*. at ¶ 43.

In her last role with Optimas, Kuntz was a Strategic Business Analyst tasked to work with Cummins. *Id*. at ¶ 37. In that role, Kuntz: (a) executed a range of sales-reporting functions designed to achieve client service and satisfaction; (b) prepared sales reports and analyzed data; (c) worked with cross-departmental teams to ensure that sales activities stayed on schedule; (d)

assisted in the development and refinement of sustainable processes and practices for price increase activity; (e) resolved item pricing questions and problems; (f) performed weekly margin reviews for changes in cost or price and worked with Grimes to adjust prices; (g) reviewed inventory positions to ensure that gap and expedited purchases were minimized; (h) worked with Cummins to review parts that had become obsolete and to help develop a draw-down plan; (i) developed reports by analyzing techniques to be used in business planning and strategic development; (j) synthesized data and identified data integrity issues through operations and financial analysis to drive performance; (k) tracked cost savings, rebate programs, and material surcharge credits; and (l) worked with Cummins to resolve ad hoc requests, which required her to utilize her knowledge of Optimas's systems and departmental processes. *Ibid.*

In his last role with Optimas, Abraham was a Customer Application Engineer tasked to work with Cummins. *Id.* at ¶ 38. In that role, Abraham: (a) provided consultation and technical direction to Optimas's engineering team; (b) provided engineering support, including Value-Added/Value Engineering ("VA/VE"), bills of material validation, line trials, and launch support; (c) managed multiple products while working cross-departmentally with the Engineering, Purchase, Quality, New Part Introduction, and Operations teams, both internally at Optimas and with Cummins; (d) advised Cummins on which new fasteners were required for new design projects; (e) rationalized part profiles to establish standardization; (f) generated engineering-based VA/VE proposals to achieve contractually required cost reductions; (g) provided logistical support on product launches; (h) completed line trials in accordance with strategic and product launch plans; (i) led technical reviews of engineering products; and (j) assisted Optimas in developing new product launches and changing existing products. *Ibid.* The

cost reductions Abraham identified frequently resulted from months of expensive and time-intensive testing and analysis. *Id*. at ¶ 40.

In their positions, Individual Defendants had direct access to, reviewed, and helped generate Optimas's Cummins-related confidential and trade secret information, including supplier pricing information, the identity of its confidential suppliers, the prices that it ultimately charged Cummins, new product launch initiatives, product mix refinement strategies, sheltered income, cost reduction strategies, Cummins-related inventory volume at various locations, product usage, internal profit and loss data, and margins. *Id*. at ¶ 39. Individual Defendants thus had direct access to the very information that drives Optimas's success with Cummins, including the parts for which Optimas earns profits, the profits on those parts, the products on which Optimas takes losses, the losses on those parts, Optimas's vertical and horizontal integration strategies, and how Optimas sources and distributes its products to Cummins. *Id*. at ¶¶ 42, 44. According to Optimas, all this information is protected by confidentiality agreements and non-disclosure obligations implemented through Optimas's contracts with Cummins and is invaluable to Optimas's business. *Id*. at ¶¶ 39, 45. Because Individual Defendants had intimate knowledge of that information, they were some of Optimas's most valued employees and are now uniquely positioned to harm Optimas. *Id*. at ¶¶ 44, 53.

**D.    Optimas's Protection of Confidential Information and Trade Secrets**

Because its confidential information and trade secrets are critical to its success, Optimas closely protects them through several policies. *Id*. at ¶ 46. Any Optimas competitor acquiring its confidential information and trade secrets would gain an immediate competitive advantage, enabling the competitor to: (1) accumulate valuable information without having to devote the time or resources that Optimas devoted; (2) quickly develop pricing strategies and services to compete with Optimas and diminish its marketplace standing and customer relations; (3)

discover initiatives that the competitor should not pursue; and (4) benefit from a customer relationship that started with Optimas. *Id*. at ¶¶ 48-49.

Each Individual Defendant signed a version of a confidentiality and non-solicitation agreement. *Id*. at ¶ 56. Kuntz signed an agreement with Anixter on March 22, 2010. *Ibid*.; Doc. 1-2. Abraham signed an agreement with Anixter on May 3, 2010. Doc. 1 at ¶ 56; Doc. 1-3. Anixter assigned those agreements to Optimas after the June 2015 spin-off. Doc. 1 at ¶ 56. Grimes signed the same agreement after the spin-off, on August 19, 2016. *Ibid*.; Doc. 1-1.

Each agreement requires that the signor:

> not use or disclose to any person or entity, directly or indirectly, other than in the regular and proper course of the Company's business, any confidential or proprietary information, knowledge or data about the Company's business, [that] is not in the public domain, learned or obtained by Employee while employed by the Company, concerning prices paid and arrangements made with suppliers, prices obtained and margins earned from customers, customer lists, key decision makers and contacts at customers, budge[t]s and sales, marketing or vendor strategies, information concerning prospective customers, quotations, bids or proposals to customers and prospective customers, employee information, compensation structures, bonus or other incentive program information or any other information, knowledge or data, the use o[r] disclosure of which might harm the Company (all of the foregoing referred to herein collectively as "Confidential and Proprietary Information"), except as required by law … .

Doc. 1 at ¶ 57; *see* Docs. 1-1; 1-2; 1-3.

Each agreement also provides that the signor agree that:

> The protection of the Company's customer and business relationships is essential and the Company has expended substantial amounts of time, effort and money to build and maintain these relationships. Accordingly, Employee shall not, either directly or indirectly, solicit or attempt to solicit any customer of the Company for products, components or services that are provided by the Company, nor shall Employee assist others with respect to such activities, for a period of twelve (12) months after Employee's termination of employment with the Company, whether that termination be voluntary or involuntary. This restriction shall apply to all customers (a) that were assigned to Employee within Employee's last twenty-four (24) months of employment, (b) for which Employee received a commission or bonus within Employee's last twenty-four (24) months of employment, or (c) for which Employee had direct or indirect supervisory or management responsibility within Employee's last (24) months of employment.

8

Doc. 1 at ¶ 58; *see* Docs. 1-1, 1-2, 1-3.

In executing their agreements, Individual Defendants acknowledged that "[t]he restrictions contained in this Agreement are necessary to protect the Company's valuable information and business interests, and the restrictions are reasonable for such purpose."  Doc. 1 at ¶ 59; Docs. 1-1, 1-2, 1-3.  The agreements required Individual Defendants to return all confidential information to Optimas upon leaving the company.  Doc. 1 at ¶ 57.

### E.      Individual Defendants' Departures from Optimas and Defendants' Alleged Bad Acts

In 2019, Cummins told Optimas that it intended to bid out certain aspects of its fasteners contract.  *Id*. at ¶ 60.  Over the course of 2019, Optimas and Grimes met extensively with Cummins, as well as internally at Optimas, to discuss the bid.  *Ibid*.  Cummins also invited Wurth to bid, as Wurth had tried for years, unsuccessfully, to displace Optimas as Cummins's fastener supplier.  *Id*. at ¶ 61.

On December 20, 2019, Individual Defendants provided two weeks' notice of their intent to leave Optimas, with a departure date of January 3, 2020.  *Id*. at ¶ 63; Docs. 1-5, 1-6, 1-7. After Grimes announced his departure, he spoke with his direct supervisor, Cliff Harris, by phone.  Doc. 1 at ¶ 64.  Harris told Grimes that his agreement with Optimas would preclude him from soliciting Cummins's business at Wurth.  *Id*. at ¶¶ 64-65.  Grimes responded that he had disclosed his agreement to Wurth and that Wurth intended to place him in a position unrelated to Cummins.  *Id*. at ¶ 65.

After its attempts to retain Individual Defendants proved unsuccessful, Optimas cut off their access to its network and required them to return their devices and other company property. *Id*. at ¶¶ 67-69.  During the week of December 27, 2019, Optimas sent Individual Defendants cease and desist letters, with copies sent to Wurth.  *Id*. at ¶ 70; Docs. 1-8, 1-9, 1-10.  Individual

Defendants did not respond to the letters. Doc. 1 at ¶ 72. On December 30, Optimas sent a cease and desist letter to Wurth, requesting that Wurth abide by the terms of Individual Defendants' agreements, not place any of them in positions where they would solicit Optimas customers, and prohibit them from using Optimas's confidential information. *Id*. at ¶ 71; Doc. 1-11.

On January 8, 2020, Grimes updated his LinkedIn profile to announce that he was now employed by Wurth as its Program Manager for Cummins. Doc. 1 at ¶ 73. As a result, Optimas decided to forensically image Individual Defendants' Optimas-issued electronic devices to determine whether they had misappropriated its trade secrets. *Id*. at ¶ 74.

Optimas discovered from the forensic images that, beginning in late August 2019, Kuntz began saving highly sensitive files in a folder named "Add to Flash Drive Nov." *Id*. at ¶ 76. Specifically, on August 27, 2019, Kuntz created the folder "My Computer\Documents\Add To Flash Drive Nov" and, within that, a subfolder named "Reports for Scott, Adam." *Id*. at ¶ 77. "Adam" refers to Grimes, and "Scott" refers to Scott McDaniel, a former Optimas employee who had previously left Optimas for Wurth and who solicited Individual Defendants to join Wurth. *Id*. at ¶¶ 78, 88. In the weeks and months following Kuntz's creation of the "Add to Flash Drive Nov" folder, hundreds of documents, including many with confidential information regarding Cummins, were added to the folder. *Id*. at ¶ 79.

Optimas's forensic investigation also uncovered that, from August 27, 2019 until December 20, 2019, Kuntz inserted three separate external media devices, none of which she returned to Optimas, into her Optimas-issued laptop. *Id*. at ¶ 81. There is no way to determine how many times she inserted the devices into her laptop over that time period. *Id*. at ¶ 82. Kuntz transferred the contents of the "Add to Flash Drive Nov" folder to one or more of the external devices for the purpose of using Optimas's Cummins-related trade secret information on Wurth's

behalf. *Id*. at ¶ 83. Kuntz was not authorized or directed to collect or download those documents onto external devices. *Id*. at ¶ 80.

Optimas's forensic investigation further revealed that, during the same time frame, Grimes inserted five separate external media devices, none of which he returned to Optimas, into his Optimas-issued laptop. *Id*. at ¶ 84. While the devices were inserted, Grimes accessed documents that would provide Wurth with a roadmap to unseat Optimas as Cummins's fastener supplier. *Id*. at ¶ 85. Optimas also determined that Grimes accessed Optimas's trade secret information from external media devices. *Id*. at ¶ 86. Optimas did not authorize or direct Grimes to collect or download that information onto external media devices. *Id*. at ¶ 87.

Optimas developed the documents accessed by Kuntz and Grimes over many years and at a significant cost. *Id*. at ¶¶ 80, 87. They are the type of documents that Optimas takes strenuous efforts to protect because they detail some of its most important trade secrets and allow it to maintain a competitive advantage in seeking Cummins's fastener business. *Ibid*. Kuntz and Grimes downloaded those documents during the period Wurth was soliciting them to join Wurth with the intent to help Wurth win Cummins's business. *Id*. at ¶ 88. At the preliminary injunction hearing, Optimas introduced several exhibits indicating that specific Optimas files were found on Individual Defendants' external devices. Optimas Prelim. Inj. Exhs. 6, 7, 70, 73, 75, 83, 94, 100, 101, 104, 109, 122, 125.

As a result of Individual Defendants' actions, Optimas stands to lose millions of dollars in Cummins business as well as the value of its goodwill, customer relationships, trade secrets, and confidential proprietary information. Doc. 1 at ¶ 91. Individual Defendants cannot perform their jobs at Wurth without using Optimas trade secrets and confidential information or without violating their Optimas agreements. *Id*. at ¶ 94. Individual Defendants have sold, and will

11

continue to try to sell, competing Wurth products to Cummins, which poses a harm to Optimas beyond monetary loss. *Id*. at ¶¶ 95-96.

**Discussion**

## I.   Rule 12(b)(2)

Rule 12(b)(2) allows a defendant to seek dismissal for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2).  Defendants argue that they are not subject to personal jurisdiction in Illinois.  Doc. 23 at 2-8.  "The plaintiff bears the burden of establishing personal jurisdiction."  *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 799 (7th Cir. 2014).  "Where, as here, the district court rules on a defendant's motion to dismiss based on the submission of written materials without holding an evidentiary hearing, the plaintiff need only make out a *prima facie* case of personal jurisdiction."  *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (internal quotation marks omitted).

"In a federal question case such as this one, a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant."  *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hous. Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010).  Because DTSA, the only federal law invoked in the complaint, "does not have a special federal rule for personal jurisdiction," the court must "look to the law of the forum for the governing rule."  *Advanced Tactical*, 751 F.3d at 800; *see also KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 723 (7th Cir. 2013) (describing "the mechanics for asserting personal jurisdiction in federal court" under Rule 4(k)); *Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 706 (N.D. Ill. 2017) ("The [DTSA] does not have nationwide service of process that would confer personal jurisdiction over all Defendants, therefore, the Court may exercise personal jurisdiction over Defendants only if personal jurisdiction would be proper in an Illinois court.").  "The Illinois long-arm statute

12

permits the court to exercise jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (citing 735 ILCS 5/2-209(c)). Accordingly, the court must determine "whether the exercise of personal jurisdiction [over Defendants] would violate federal due process." *Mobile Anesthesiologists*, 623 F.3d at 443.

"Under the Fourteenth Amendment's Due Process Clause, a court may exercise personal jurisdiction over an out-of-state defendant when that defendant has 'minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912-13 (7th Cir. 2015) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (alteration in original) (internal quotation marks omitted). "The defendant's conduct and connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there. This purposeful-availment requirement ensures that a defendant's amenability to jurisdiction is not based on 'random, fortuitous, or attenuated contacts,' but on contacts that demonstrate a real relationship with the state with respect to the transaction at issue." *N. Grain*, 743 F.3d at 492-93 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (internal quotation marks omitted) (citations omitted). "While there are two branches of personal jurisdiction theory—general and specific," *Philos*, 802 F.3d at 913, Optimas focuses solely on specific jurisdiction.

"Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities. The exercise of specific jurisdiction must also comport with traditional notions

of fair play and substantial justice." *N. Grain*, 743 F.3d at 492 (internal quotation marks and citations omitted). "Only intentional contacts by the defendant with the forum jurisdiction can support specific jurisdiction." *Noboa v. Barceló Corporación Empresarial, SA*, 812 F.3d 571, 572 (7th Cir. 2016); *see also Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."). Accordingly, "[i]t is the defendant—not the plaintiff or third parties—that must create the contacts in the forum state, and those contacts must be 'with the forum State itself, not … with persons who reside there.'" *Philos*, 802 F.3d at 913 (quoting *Walden*, 571 U.S. at 285); *see also Advanced Tactical*, 751 F.3d at 801 ("The relevant contacts are those that center on the relations among the defendant, the forum, and the litigation."). Put another way, "[t]he 'mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction,'" *Advanced Tactical*, 751 F.3d at 801 (quoting *Walden*, 571 U.S. at 291), and "'the plaintiff cannot be the only link between the defendant and the forum,'" *id.* at 802 (quoting *Walden*, 571 U.S. at 285); *see also Noboa*, 812 F.3d at 572 ("[*Walden*] shows that the pertinent question is whether the defendant has links to the jurisdiction in which the suit was filed, not whether the plaintiff has such links … .").

Applying these principles, Optimas has made the *prima facie* showing necessary to hold that Defendants are subject to personal jurisdiction in Illinois: Defendants purposefully directed their activities towards Illinois; Optimas's alleged injuries arise from Defendants' forum-related activities; and exercising jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.

First, on the present record, Defendants "purposefully directed [their] activities at [Illinois] or purposefully availed [themselves] of the privilege of conducting business in [Illinois]." *N. Grain*, 743 F.3d at 492 (internal quotation marks omitted).  Individual Defendants signed agreements with Optimas containing Illinois choice-of-law provisions, Doc. 47 at 12; Docs. 1-1, 1-2, 1-3; interacted regularly with Illinois-based Optimas personnel, Doc. 47 at 14; and traveled to Illinois in connection with their work, *ibid.*  Grimes participated in a face-to-face meeting with Cummins in Illinois in February 2019, Doc. 9-1 at ¶ 17; attended meetings in Illinois with other Optimas personnel to discuss the company's relationship with Cummins in May, August, and September 2019, *ibid.*; and worked fifteen days per year in Illinois, Doc. 23-2 at ¶ 11.  Abraham met with his Optimas supervisor in Illinois at least once per year to discuss engineering solutions for Cummins, Doc. 9-3 at ¶ 3; Doc. 23-4 at ¶ 11.  Kuntz traveled to Illinois at least twice for her work with Optimas, Doc. 23-3 at ¶ 11, and communicated with her Illinois-based supervisor nearly every day, Doc. 1 at ¶ 24.  Wurth was aware of Individual Defendants' agreements with Optimas, *id*. at ¶ 130; received the cease and desist letters Optimas sent to Individual Defendants and Wurth, *id*. at ¶¶ 70-71; and solicited Individual Defendants to steal the trade secrets of an Illinois company, *id*. at ¶¶ 111, 131, 139.  This "'suit-related conduct'" was purposefully directed at Illinois.  *Advanced Tactical*, 751 F.3d at 801 (quoting *Walden*, 571 U.S. at 284) (emphasis omitted).

Second, on the present record, Optimas's "alleged injury arises out of [Defendants'] forum-related activities." *N. Grain*, 743 F.3d at 492 (internal quotation marks omitted).  Individual Defendants allegedly misappropriated trade secret information from Optimas's servers in Illinois, and Wurth allegedly induced Individual Defendants to undertake that misappropriation.  Doc. 1 at ¶¶ 23-26, 81, 84-86; Doc. 47 at 14-15; Optimas Prelim. Inj. Exhs. 6,

7, 70, 73, 75, 83, 94, 100, 101, 104, 109, 122, 125.  Given all this, Defendants' conduct did not merely "'affect[] [a plaintiff] with connections to [Illinois].'"  *Advanced Tactical*, 751 F.3d at 802 (quoting *Walden*, 571 U.S. at 291).  Rather, the "relation between [Defendants] and [Illinois] '… ar[o]se out of contacts that [Defendants] create[d] with [Illinois].'"  *Ibid*. (quoting *Walden*, 571 U.S. at 284) (internal quotation marks omitted).  Given this, Optimas is not "the only link between the defendant and the forum."  *Ibid*. (quoting *Walden*, 571 U.S. at 285).

Third, exercising specific jurisdiction over Defendants in Illinois would "comport with traditional notions of fair play and substantial justice."  *N. Grain*, 743 F.3d at 492.  The factors relevant to this inquiry include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies."  *Felland*, 682 F.3d at 677 (quoting *Burger King*, 471 U.S. at 477).  "[T]hese factors rarely will justify a determination against personal jurisdiction because there are other mechanisms available … to accommodate the various interests at play."  *Illinois v. Hemi Grp., LLC*, 622 F.3d 754, 760 (7th Cir. 2010) (internal quotation marks omitted).

Defendants devote only a paragraph to the "fair play and substantial justice" requirement. Doc. 23 at 8.  They first argue that Individual Defendants "do not currently reside in … and have no contact with Illinois related to the Complaint."  *Ibid*.  That argument fails, for even though Individual Defendants do not reside in nor have any present interaction with Illinois, their suit-related contacts with Illinois, detailed above, more than suffice to make fair and just the exercise of jurisdiction over them.  Second, Defendants argue that "it would be a tremendous burden … to maintain a defense in Illinois when Wurth [is] not incorporated in Illinois, does not have its

principal places of business in Illinois, and most importantly, has not purposefully availed itself of the benefits and protection of Illinois' laws." *Ibid*. But Defendants do not explain how Wurth would face a "tremendous burden" by being subject to jurisdiction here, nor do they account for Illinois's "strong interest in providing a forum for its residents … to seek redress for tort injuries suffered within the state and inflicted by out-of-state actors." *Tamburo v. Dworkin*, 601 F.3d 693, 709 (7th Cir. 2010); *see also Felland*, 682 F.3d at 677 ("'[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'") (quoting *Burger King*, 471 U.S. at 477).

## II.    Rule 12(b)(3)

Rule 12(b)(3) allows a defendant to seek dismissal for "improper venue." Fed. R. Civ. P. 12(b)(3). Although Defendants asked the court to dismiss on this ground, Doc. 23 at 8, their initial brief argued not that venue is improper in this District, but that the case should be transferred. Doc. 23 at 9-12. At the court's suggestion, Doc. 38, Defendants filed a supplemental brief, properly categorizing its transfer argument as one arising under § 1404(a) rather than Rule 12(b)(3), Doc. 42. As Defendants fail to support their Rule 12(b)(3) motion with legal or factual support, the motion fails. *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument … .").

The motion fails on the merits in any event. Under 28 U.S.C. § 1391(b)(2), venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." As shown in the court's discussion of personal jurisdiction, "a substantial part of the events or

17

omissions giving rise to [Optimas's] claim[s] occurred" in this District, and "a substantial part of property that is the subject of the action"—Optimas's confidential and trade secret information—"is situated" here. 28 U.S.C. § 1391(b)(2). Thus, venue is proper in this District.

## III. Section 1404(a)

Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought … ." 28 U.S.C. § 1404(a). Transfer under § 1404(a) "is appropriate if: (1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interest of justice." *Law Bulletin Publ'g Co. v. LRP Publ'ns, Inc.*, 992 F. Supp. 1014, 1017 (N.D. Ill. 1998); *see also Atl. Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49, 62 (2013) ("In the typical case …, a district court considering a § 1404(a) motion … must evaluate both the convenience of the parties and various public-interest considerations."); *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) ("The statutory language … is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice."). The moving party bears the burden of demonstrating that a transfer is "clearly" warranted. *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir. 1989) ("[The defendant] has the burden of showing that the transferee forum is clearly more convenient.") (internal quotation marks omitted). "The weighing of factors for and against transfer necessarily involves a large degree of subtlety and latitude, and, therefore, is committed to the sound discretion of the trial judge." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986).

As to the first step of analysis, the court determined above that venue is proper in this District, the proposed transferor court. Venue also is proper in the Southern District of Indiana, the proposed transferee court. Because Individual Defendants live in that District, Doc. 1 at

¶¶ 18-20, worked for Optimas in that District, Docs. 61-63, 66, and were recruited to work for Wurth in that District, *ibid*., "a substantial part of the events or omissions giving rise to the claim occurred" there, 28 U.S.C. § 1391(b)(2).

The second step in the analysis looks to convenience. The convenience factors include "(1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience [of] the parties … ." *Law Bulletin Publ'g*, 992 F. Supp. at 1017.

The first factor favors this District. A plaintiff's choice of forum typically deserves "substantial weight, particularly when it is his home forum," *Baker v. Smith & Wesson Corp.*, 2019 WL 277714, at *3 (N.D. Ill. Jan. 22, 2019), and this District is Optimas's home forum.

The second factor, which looks to the situs of material events, is a wash. On the one hand, Optimas is headquartered in this District, Doc. 47-1 at ¶ 6, and stores here the allegedly misappropriated data, Doc. 47 at 14; Doc. 1 at ¶¶ 23-26. Individual Defendants also traveled to this District as part of their Cummins-related work for Optimas, Doc. 47 at 14; Doc. 9-1 at ¶ 17; Doc. 23-2 at ¶ 11; Doc. 9-3 at ¶ 3; Doc. 23-3 at ¶ 11; Doc. 23-4 at ¶ 11, and communicated with District-based Optimas officials concerning Cummins, Doc. 1 at ¶ 24; Doc. 47 at 9. On the other hand, Individual Defendants lived in the Southern District of Indiana while working for Optimas, allegedly misappropriated the confidential data while working in an Indiana-based Optimas office, and still live in Indiana while working for Wurth—whose headquarters is in Greenwood, Indiana. Doc. 42 at 3-4.

As to the third and fifth factors—the relative ease of access to sources of proof and the convenience of the parties—Defendants fail to offer factual support for either in their

supplemental brief, Doc. 42 at 4-7, resulting in forfeiture. *See Milligan*, 686 F.3d at 386.
Forfeiture aside, those factors are no better than a wash for Defendants.

The fourth factor, the location and convenience of non-party witnesses, is neutral as well.
"Convenience of non-party witnesses is often the most important factor, as the § 1404 calculus is
generally less concerned about the burden that appearing at trial might impose on witnesses who
are either employees of parties or paid experts because it is presumed that such witnesses will
appear voluntarily." *Ratliff v. Venture Express, Inc.*, 2019 WL 1125820, at *11 (N.D. Ill. Mar.
12, 2019) (internal quotation marks omitted); *see also Carter v. Baldwin*, 2017 WL 3310976, at
*3 (N.D. Ill. Aug. 3, 2017) (same); *Sojka v. DirectBuy, Inc.*, 2014 WL 1089072, at *3 (N.D. Ill.
Mar. 18, 2014) (same). But neither side identifies any non-party witnesses, Doc. 42 at 5; Doc.
47 at 21, resulting in this factor having no effect on the convenience calculus.

The final step of the transfer analysis looks to the interest of justice. "The 'interest of
justice' is a separate element of the transfer analysis that relates to the efficient administration of
the court system." *Research Automation*, 626 F.3d at 978 (quoting *Van Dusen v. Barrack*, 376
U.S. 612, 626-27 (1964)). The relevant factors include "[(1)] docket congestion and likely speed
to trial in the transferor and potential transferee forums; [(2)] each court's relative familiarity
with the relevant law; [(3)] the respective desirability of resolving controversies in each locale;
and [(4)] the relationship of each community to the controversy." *Ibid*. (citations omitted).

The first factor—docket congestion and speed to trial—is neutral. The median time from
filing to disposition is 8.4 months in this District and 8.0 months in the Southern District of
Indiana. United States District Courts—National Judicial Caseload Profile 47, 51 (2019),
https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2019.pdf. The

median time from filing to trial is 39 months here and 35.9 months in the Southern District of Indiana. *Ibid*. This case will likely proceed at a materially similar pace in either forum.

The second factor—familiarity with the relevant law—favors this District. While this District and the Southern District of Indiana are equally familiar with DTSA, *see Cent. States, Se. & Sw. Areas Pension Fund v. Ehlers Dist. Inc.*, 2012 WL 581246, at *4 (N.D. Ill. Feb. 22, 2012) ("The second factor, familiarity with relevant law, also is a wash. The ERISA and MPPAA principles at issue in this case are federal, leaving both courts fully capable of resolving the legal issues presented by the Fund's suit."), Optimas's other claims arise under Illinois law. That favors this District, which, compared to the Southern District of Indiana, has greater familiarity with Illinois law. *See Nero v. Am. Family Mut. Ins. Co.*, 2011 WL 2938138, at *4 (N.D. Ill. July 19, 2011) ("The District of Colorado has far greater familiarity than this District with the [Colorado statutes at issue]—not only in general, but also as applied specifically to the alleged failure of Defendants' automobile insurance policies to provide proper … coverage under Colorado law."); *cf. Coffey*, 796 F.2d at 221 ("In a diversity action it is … considered advantageous to have federal judges try a case who are familiar with the applicable state law.").

The third factor—the respective desirability of resolving controversies in each district—is a wash. Both Illinois and Indiana have an interest in this suit. While Defendants correctly note that "Indiana has [an] interest in policing the activities of its citizens," Doc. 42 at 8, Illinois has an interest in policing the property stored within its borders, upholding contracts governed by its laws, and offering protection to companies headquartered here. The fourth factor—the relationship of each community to the controversy—is a wash as well, as both districts have a relationship with the parties' dispute.

21

In sum, both the convenience factors and the interest of justice factors, on balance, slightly favor Optimas. Given this, Defendants have not met their burden of showing that transfer to the Southern District of Indiana is clearly warranted.

## IV.    Rule 12(b)(6)

Defendants move under Rule 12(b)(6) to dismiss Optimas's tortious interference with contract and unfair competition claims, both directed at Wurth. Doc. 23 at 12-14.

"To state a claim under Illinois law for tortious interference with contracts, a plaintiff must demonstrate: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Healy v. MPEA*, 804 F.3d 836, 842 (7th Cir. 2015) (internal quotation marks omitted). Optimas states a tortious interference claim, having pleaded that: (1) "a valid and enforceable contract" existed between it and Individual Defendants prohibiting them from "either directly or indirectly, solicit[ing] or attempt[ing] to solicit [Cummins] for products, components or services that are provided by [Optimas]" or "assist[ing] others with respect to such [solicitation or attempted solicitation], for a period of twelve (12) months after [their] termination of employment with [Optimas], whether that termination be voluntary or involuntary," Doc. 1 at ¶ 58; Docs. 1-1, 1-2, 1-3; (2) Wurth was aware of the contracts, Doc. 1 at ¶ 130; (3) Wurth intentionally induced Individual Defendants to breach the contracts when it hired them for the purpose of soliciting Cummins's business, *id*. at ¶ 131; (4) Individual Defendants breached the contracts as a result of Wurth's inducement when they solicited Cummins's business on Wurth's behalf less than a year after leaving Optimas, *id*. at ¶ 95; and (5) those actions damaged Optimas's business relations with Cummins, *id*. at ¶¶ 96-97. That suffices to survive dismissal at the pleading stage. *See Healy*, 804 F.3d at 842.

22

"Stating a claim for unfair competition under Illinois common law is not a simple task because the Illinois courts have not specifically enumerated the requisite elements." *LG Elecs. v. Whirlpool Corp.*, 2010 WL 3521785, at *2 (N.D. Ill. Sept. 1, 2010) (St. Eve, J.) (internal quotation marks omitted). As the Seventh Circuit has noted, "[t]he law of unfair competition … is elusive" and "its elements [frequently] escape definition." *Wilson v. Electro Marine Sys., Inc.*, 915 F.2d 1110, 1118 (7th Cir. 1990). Nonetheless, the Seventh Circuit determined that "[t]he essence of an unfair competition claim … is that the defendant has misappropriated the labors and expenditures of another," with "some element of bad faith" being "central" to the claim. *Ibid*. (internal quotation marks omitted). Ultimately, the Seventh Circuit identified these elements of an unfair competition claim: "(1) that the defendant obtained access to the [labors and expenditures of the plaintiff] through an abuse of a fiduciary or confidential relationship with the plaintiff or via some sort of fraud or deception" and "(2) that the defendant's use of the [labors and expenditures] deprived the plaintiff of the opportunity to reap its due profits … ." *Id.* at 1119 (internal quotation marks omitted).

Optimas states an unfair competition claim, having pleaded that: (1) Wurth "target[ed] Optimas's employees" and "hir[ed] Optimas's employees *en masse*" in an attempt to solicit Cummins's business, Doc. 1 at ¶ 139, despite the agreements between Individual Defendants and Optimas prohibiting such solicitation, *id*. at ¶ 130; and (2) Wurth's hiring Individual Defendants has resulted, or inevitably will result, in their soliciting Cummins's business away from Optimas, *id*. at ¶¶ 94-97. That is, Optimas pleads that "[Wurth] obtained access to" the labors and expenditures of Optimas when it hired Individual Defendants, and that Wurth's "use of [Individual Defendants] deprived [Optimas] of the opportunity to reap its due profits" from the

value of those employees. *Wilson*, 915 F.2d at 1119 (internal quotation marks omitted). That suffices to survive dismissal at the pleading stage.

Pressing the contrary result, Defendants argue that the tortious interference and unfair competition claims are preempted by ITSA. Doc. 23 at 12-13. ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). However, ITSA does not preempt "contractual remedies, whether or not based upon misappropriation of a trade secret," or "other civil remedies that are not based upon misappropriation of a trade secret." 765 ILCS 1065/8(b)(1)-(2). Accordingly, common law "claims are foreclosed [by ITSA] only when they rest on the conduct that is said to misappropriate trade secrets." *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404-05 (7th Cir. 2005); *see also id.* at 405 ("An assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record."). Although "ITSA mostly codifies rather than modifies the common law doctrine that preceded it," *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995), a plaintiff cannot plead in the alternative to avoid ITSA preemption. As the Seventh Circuit recently held: "Illinois courts have read the preemptive language in the ITSA to cover claims that are essentially claims of trade secret misappropriation, even when the alleged 'trade secret' does not fall within the Act's definition." *Spitz v. Proven Winners N.A., LLC*, 759 F.3d 724, 733 (7th Cir. 2014) (citing *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 619 (1998)).

ITSA does not preempt Optimas's tortious interference or unfair competition claims because neither depends on trade secret misappropriation. As to tortious interference, Optimas alleges that its agreements with Individual Defendants prohibited them from soliciting

24

Cummins's business on Wurth's behalf, Doc. 1 at ¶ 58; Docs. 1-1, 1-2, 1-3, and that, despite its knowledge of those agreements, Wurth induced Individual Defendants to solicit Cummins's business on its behalf, Doc. 1 at ¶¶ 130-131. Accordingly, even if no trade secret misappropriation occurred, Optimas still could proceed with and prevail on its tortious interference claim, which means that ITSA does not preempt the claim. *See Hecny Transp., Inc.*, 430 F.3d at 404-05. The same result obtains for the unfair competition claim: Optimas alleges that Wurth unfairly competed when it improperly targeted Optimas's employees, hired them en masse, and employed them for the purpose of diverting Cummins's business to Wurth. Doc. 1 at ¶ 139. Thus, even if no trade secret misappropriation occurred, Optimas could proceed with and prevail on the unfair competition claim. *See Hecny Transp., Inc.*, 430 F.3d at 404-05.

Defendants also argue that Optimas's tortious interference with contract claim fails, reasoning that because Individual Defendants had at-will employment agreements, Optimas's claim in fact sounds in tortious interference with prospective economic advantage. Doc. 23 at 13-14. As an initial matter, a claim's label does not matter at the pleading stage because "[a] complaint need not identify legal theories." *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 744 (7th Cir. 2015). In any event, Defendants are incorrect. *See Empire Indus. v. Winslyn Indus.*, 327 F. Supp. 3d 1101, 1110-11 (N.D. Ill. 2018) (rejecting the proposition that a tortious interference with contract claim necessarily fails under an at-will contract). The Seventh Circuit cases cited by Defendants support only the narrow proposition that a tortious interference with contract claim cannot be predicated on the *cancelling* of an at-will employment contract; those cases say nothing of a claim predicated on the *breach* of such a contract. *See Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) ("Under Illinois law, a defendant's inducement of the *cancellation* of an at-will contract constitutes at most interference with a prospective economic

25

advantage, not interference with contractual relations.") (internal quotation marks and alteration omitted) (emphasis added); *Prudential Ins. Co. of Am. v. Sipula*, 776 F.2d 157, 162 (7th Cir. 1985) (same).  Here, Optimas complains not that Individual Defendants cancelled their contracts with Optimas, but that they breached the provisions of those contracts prohibiting them from soliciting Cummins for a twelve-month period.  That is the proper subject of a tortious interference with contract claim.  *Cf. Empire Indus.*, 327 F. Supp. 3d 1111 (holding that "the [at-will] licensing agreements contemplate an action for breach of contract if the licensee continues to use the licensed material after the license expires") (internal quotation marks omitted).

## Conclusion

Defendants' motion to dismiss and motion to transfer are denied.

July 30, 2020

_____

United States District Judge